ROBERT L. DAY & others *vs.* DAVID W. HOLMES.
SAME *vs.* SAME & trustee.
DAVID W. HOLMES *vs.* ROBERT L. DAY & others.

The order of a customer to a broker to buy stock, deliverable at any time, at buyer's option, in sixty days, does not authorize the broker to buy the stock himself at thirty days, and deliver it to his customer at the end of sixty days at an increased price and interest, besides the usual commission; and a usage of brokers so to do is bad; nor is the exchange of bought and sold notes between the broker and his customer, nor the giving of his note by the customer in payment for the stock, in ignorance of the broker's conduct, a ratification of his acts.

A person to whom certificates of mining stock with blank assignments had been pledged filled up the assignments, had new certificates made out to himself, and afterwards had some of the stock transferred to J. S., as trustee, and the rest by assignments, absolute on their face, to other persons. *Held*, that it was competent for him to prove, in defence to an action by the pledgor against him for the conversion of the stock, that he made these transfers because he thought that it would injure his credit to have so many mining stocks standing in his name; that no consideration was paid for any of these transfers; that he took back blank assignments from all the transferees except J. S.; and that all the stocks remained in his control and ready for delivery to the owner on the payment of the amount for which they were pledged. *Held, also*, that these facts, if proved, were a good defence to the action.

THE FIRST TWO actions were on promissory notes made by the defendant; the third action was brought by the defendant in

the former actions against the plaintiff in those actions, to recover for the alleged conversion of shares of mining stock. The cases were referred to George W. Phillips, Esq., as auditor, and submitted to the judgment of the superior court upon his report as an agreed statement of facts.

The auditor found that " there was a general, well known usage, among stockbrokers in Boston, in filling orders for stock " deliverable at any time, at buyer's option, within a certain period, with interest, at a sum not exceeding a certain price, " to buy the stock for cash, or on a shorter time than ordered, in their own names, not disclosing the names of their principals, and to turn the same, as it is called, or carry it till the maturity of the contract, and to charge therefor a brokerage, in addition to the usual commissions for buying, as compensation for the risk of such carrying ; that the amount of such extra brokerage differed with different stocks, and with the length of time for which they were carried, being greater in the case of some stocks and smaller in that of others, and greater for a long time and less for a short one ; that such usage was well known among persons dealing in stocks of the description in question ;" but that " there was no evidence of actual knowledge by the defendant of such usage."

The superior court ordered judgment for the plaintiffs, in the first two actions, for a sum in computing which the amounts of two of the notes sued on, given by the defendant in settlement of purchases of stock in the Pontiac and Hancock Mining Companies, were excluded; and in the third case, for the defendants; and both parties appealed The other facts are stated in the opinion.

*T. Weston, Jr.*, for Day & others.

*J. D. Bryant & F. Goodwin*, for Holmes.

MORTON, J. The able report of the auditor, and his clear marshalling of the complicated facts of these cases, have greatly aided the court in determining the principles of law which underlie the rights of the parties.

The first controverted question which arises is, as to the validity of two notes given by the defendant in settlement of

the purchase of the Pontiac and the Hancock stocks. The transactions in regard to each of these notes are substantially the same. It is therefore necessary to consider in detail only one of them. The facts as to the Pontiac stock are as follows: On August 30, 1866, the defendant gave to the plaintiffs (who were stockbrokers) an order which it is admitted meant, when filled out in words, " Buy for D. W. Holmes 500 shares of Pontiac mining stock, deliverable at any time at buyer's option, in 60 days and 3 days grace, with interest, at a price not exceeding $2 per share, the order to stand open for two weeks." On or about September 6, 1866, the plaintiffs exchanged with the defendant bought and sold contracts, in which the said 500 shares of Pontiac stock were stated as bought at $1.75 per share, deliverable in sixty days, at buyer's option, and the words " and brokerage " added at the foot. At the expiration of said sixty days and grace, namely, on November 8, 1866, the plaintiffs made to the defendant the written statement of which the following is a copy:

" R. L. Day & Co. Boston, November 8, 1866.
　Bought for D. W. Holmes, 500 Pontiac Mining
　　　　Co., 1¾, . . . . . . . $875 00
　 $\frac{1}{16}$ Brokerage, . . . . . . 31 25

　　　　　　　　　　　　　　　　　　 906 25
　　63 days' interest, and stamp, . . . . 10 36

　　　　　　　　　　　　　　　　　　 $916 61 "

Thereupon the bought and sold contracts were mutually surrendered, and the defendant gave the plaintiffs the note in question for $916.61. The plaintiffs were unable, at the time when the said order was given, to buy the stock in question on sixty days; they could have bought it for $1.50 cash per share; but they did in fact buy it, through other brokers, on thirty days, at $1.62½ per share, and not at $1.75 as charged in said written statement. At the end of said thirty days and grace, the plaintiffs paid for said stock at $1.62½ per share, and interest and commissions, and a certificate was issued in their names, they

holding the same as collateral to cover this contract with the defendant. The defendant had no knowledge of the manner in which the plaintiffs procured this stock, or of the amounts paid therefor. Upon these facts, we are of opinion that the defendant is not liable upon the note in question. The course of the plaintiffs in buying the 500 shares of stock, as above stated, was not an execution of the order of the defendant, and was unauthorized by him. It was a departure from the instructions of their principal, and he was not bound to take and pay for the stock thus purchased. *Pickering* v. *Demerritt,* 100 Mass. 416. The defendant gave his note in settlement for this stock without knowledge that his order had not been duly executed. The exchange by the plaintiffs of the bought and sold contracts, and the rendering of the account of November 8, without notice to the defendant of the real facts, amounted to a legal fraud upon him. These acts of the plaintiffs were equivalent to a misrepresentation by them of material facts, the natural and necessary effect of which was to mislead the defendant and induce him to give his note under a deception thus practiced upon him by the plaintiffs.

The argument that by exchanging the bought and sold contracts the defendant ratified the act of purchase by the plaintiffs is unsound, because at the time of doing so the defendant was ignorant of the fact that his order had not been duly executed.

The usage alleged by the plaintiffs to exist among stockbrokers in Boston cannot avail them. There are many forcible objections to its validity; but a conclusive one is, that it is against sound policy and good morals. It authorizes the broker, in his discretion, to disregard his instructions, and, instead of acting solely in the interest of his principal, to speculate upon the transaction for his own benefit. It creates in the agent an interest adverse to his principal, and is inconsistent with his duty and the obligations which the law imposes upon him when he enters into the contract of agency. Such a usage, unknown to the principal, cannot be supported.

It follows from these considerations that the plaintiffs are not entitled to recover on the two notes given for the Pontiac and Hancock stocks.

The remaining notes held by the plaintiffs are admitted to be valid. The auditor has found certain payments and credits, which it is conceded should be applied in partial extinguishment of these notes. But the defendant claims that, in addition thereto, he should be allowed the value of the stocks sold by the plaintiffs as collateral, in February and March 1867, upon the ground that the acts of the plaintiffs in regard to them in law amounted to a conversion. Upon this claim two questions arise:

1. It appears from the auditor's report that the defendant lodged with the plaintiffs certificates of 200 shares of Humboldt Mining Company, and 200 shares of Petherick Mining Company, not purchased by the plaintiffs, as general collateral security for his indebtedness to them, with assignments in blank, and on the 15th and 16th of February 1867 the plaintiffs filled up the blank assignments by inserting their own names, and new certificates were issued to them. This was in no sense a sale of the stock to themselves. The delivery to them of the assignment in blank necessarily implied the right to insert their own names, and the doing so and taking out of new certificates was in accordance with the implied contract of the parties, and a lawful and reasonable measure to protect their security, and can upon no principle be deemed an unlawful conversion.

2. We are of opinion that the transfers of this stock, made March 4, 1867, did not in law amount to a conversion. It appears from the evidence, which was clearly admissible, that these transfers were made by the plaintiffs in good faith, for the purpose of relieving themselves from supposed damage to their credit by reason of holding so many of these stocks, that there was no contract of sale of any of them, that no money or other consideration was paid or agreed to be paid therefor, that they took back from the transferees, except in the case of the transfer to Charles E. Eddy, Jr., as trustee, blank assignments, and that all the said stocks, including the Eddy stock, remained under their control and ready for delivery to the defendant on payment of his notes held by them. It was obviously not the intention of the plaintiffs to exercise any dominion over these stocks in-

consistent with the rights of the defendant. His rights were not in fact violated or injuriously affected. He could at any time have received his collaterals upon payment of his debts. There having been no demand and refusal, and the defendant having sustained no injury from the acts of the plaintiffs, we are of opinion that they did not amount to a conversion. *Wood* v. *Hayes*, 15 Gray, 375.

The only other question presented is, as to the sum of $512.39 indorsed on the note given for the Pontiac stock as of December 15, 1866. The plaintiffs' claim, that this sum should not be credited to the defendant in general account, cannot be sustained. The auditor finds that it is to be credited on general account, and nothing appears to impeach the correctness of his finding. It is clear that a different finding could not be sustained.

The result is, that the judgment of the superior court must

*Affirmed.*